**SECURITY BENEFIT LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 77–4201.

United States District Court, D. Kansas.

Aug. 4, 1980.

E. P. Baker, Washington, D.C., Ross Freeman, Topeka, Kan., for plaintiff.

Bruce I. Crocker, Dept. of Justice, Tax Division, Washington, D.C., James P. Buchele, U.S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

### INTRODUCTION

ROGERS, District Judge.

This is an action pursuant to Section 7422 of the Internal Revenue Code of 1954 (26 U.S.C.), for the recovery of federal income taxes, plus interest, paid by the plaintiff for its taxable year 1968. Over one-half million dollars are in controversy. Jurisdiction is conferred upon the Court by 28 U.S.C. § 1346(a)(1).

The plaintiff is a life insurance company whose claim is based upon the carryback to 1968 of a loss from operations for its taxable year 1971. Thus, while this is an action for refund of taxes and interest paid for 1968, the issues presented involve items on the plaintiff's 1971 income tax return.

The rather complicated issues presented in this case arise from two unrelated events —(1) plaintiff's acquisition in 1971 of all the insurance business of a fraternal benefit society, the Ladies' Society of the Brotherhood of Locomotive Firemen and Enginemen ("Society"), and (2) the plaintiff's change in 1971 of its method of accounting

for loading on deferred and uncollected premiums as a consequence of the Supreme Court's decision in *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977).

Although these two events will be discussed in detail in the Court's findings of fact *infra*, a brief description of their factual backgrounds may be helpful to an understanding of the issues presented.

*Assumption Reinsurance Transaction*

The first event arises from plaintiff's acquisition of the insurance business of the Ladies Society of the Brotherhood of Locomotive Firemen and Enginemen. Organized in 1884, the Society provided insurance benefits to its members, including funeral and life insurance benefits. Due to declining membership and the advanced age of its members, the Society began to face an "assessment spiral." The Society solicited offers and ultimately concluded an arrangement with plaintiff whereby the premiums charged members were raised from $12 to $15 per thousand, the plaintiff assumed all liabilities under the policies, and the Society transferred to the plaintiff all of its assets which were set aside to pay benefits due under the policies. Plaintiff obtained the permission of the State Insurance Commissioner to carry securities transferred from the Society at the par value for Annual Statement purposes, though the market value of the securities had declined substantially. The par value was approximately $7,569,000; the market value was approximately $5,543,110. Plaintiff assumed liabilities which required it to establish reserves of about $7,554,519.

In filing its 1971 tax return, which showed a $2,679,881 loss from operations, the plaintiff took the tangible assets into account at the $5,943,814 value, and the reserves at the claimed $7,554,519. In rejecting this tax treatment, the I.R.S. stated in a Notice of Deficiency:

> It is determined that you paid the Ladies' Society of the Brotherhood of Locomotive Firemen and Enginemen $1,769,111.00 for the purchase of the insurance contracts you acquired in connection with the assumption reinsurance transaction, which amount is equal to the excess of the amount of the increase in the reserves over the net amount of assets you received from that Society. Accordingly, $1,769,111.00 is includible in your premium income in 1971 and is amortizable over the estimated life of the contracts, 10 years from July 1, 1971.

The transaction between plaintiff and the Society is termed, in insurance parlance, an "assumption reinsurance transaction." SBL is the reinsurer and the Society the reinsured. This transaction raises questions regarding how great a sum plaintiff should be deemed to have paid for the insurance business of the Society, and how plaintiff should have established reserves to cover the liabilities assumed.

*§ 481 Adjustment—Standard Life Case*

For many years, life insurance companies and the I.R.S. disagreed as to the proper manner of treating unpaid deferred and uncollected premiums for income tax purposes. In *Commissioner v. Standard Life & Accident Ins. Co., supra*, 433 U.S. at 150–151, 97 S.Ct. at 2525, the Supreme Court pointed out:

> Under normal accounting rules, unpaid premiums would simply be ignored. They would not be properly accruable since the company has no legal right to collect them. Nevertheless, for the past century, insurance companies have added an amount equal to the net valuation portion of unpaid premiums to their reserves, with an offsetting addition to assets. State law uniformaly requires this treatment of unpaid premiums, as does the accounting form issued by the National Association of Insurance Commissioners (NAIC).

> · · · · ·

> ... In his [the Commissioner's] view, if reserves are calculated on the fictional assumption that these premiums have been paid, the same assumption should apply to the calculation of assets and gross premium income.

After viewing the arguments of the parties, the Supreme Court "split the baby", holding that

> ... the net valuation portion of unpaid premiums, *but not the loading*, must be included in assets and gross premium income, as well as in reserves. (emphasis added) (433 U.S. at 151, 97 S.Ct. at 2526]

Between 1958 and 1970, plaintiff was required by the Internal Revenue Service to include the loading portion of unpaid premiums in its assets and gross premium income. Because of the erroneous position taken by the I.R.S., plaintiff overpaid its taxes for this time period. The parties agree that due to the Supreme Court's decision in *Standard Life*, plaintiff is entitled to an adjustment in its income taxes pursuant to 26 U.S.C. § 481(a) in order to prevent duplicate reporting of income. However, the parties disagree as to the amount of the adjustment and whether plaintiff may take advantage of said adjustment in a single year, 1971, or whether the adjustment must be spread over a period of years.

## ISSUES PRESENTED

According to the pretrial order, this case presents the following issues of law:

1. What amount is includible in plaintiff's 1971 income as consideration received from the Society in exchange for plaintiff's obligation to pay death benefits to the members of the Society.

2. If the amount so includible in plaintiff's 1971 income is greater than that reported on its 1971 return, whether plaintiff is entitled to a deduction in 1971 of the excess, or whether such amount must be amortized.

3. If the amount so includible in plaintiff's 1971 income is not greater than that reported on its 1971 return, whether a portion of plaintiff's 1971 year-end reserve of $7,554,519 attributable to its obligations to the Society members constituted a deficiency reserve within the meaning of section 801(b)(4) of the Internal Revenue Code.

4. Whether plaintiff is entitled in 1971 to an adjustment under section 481 of the Internal Revenue Code as a result of the 1971 change in the tax treatment of its loading on deferred and uncollected premiums, and if so, in what amount.

In their briefs, the parties have effectively merged issues one and two, and have discussed the legal issues presented within the context of three major questions, the first two of which relate to the transaction regarding the Society and the final of which relates to the results of the *Standard Life case: (1) Did plaintiff properly file its 1971 income tax return in reporting the consideration it received for providing benefits to members of a fraternal society? (2) Is any part of SBL's 1971 year-end reserve for benefits provided to Society members a "deficiency reserve" within the meaning of 26 U.S.C. § 801(b)(4)? (3) How should plaintiff's 26 U.S.C. § 481 adjustment in response to the* Standard Life *case be calculated?*

After overruling cross motions for summary judgment, the Court heard evidence on the merits of this action on May 27–29, 1980. The Court is now prepared to rule.

## INTRODUCTORY FINDINGS OF FACT

1. This is an action pursuant to 26 U.S.C. § 7422 for the recovery of federal income taxes of $528,017, plus interest, paid by the plaintiff, Security Benefit Life Insurance Co. for its taxable year 1968.

2. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a)(1).

3. Plaintiff's claim is based upon the carryback to 1968 of a loss of operations from its taxable year 1971. Thus, while this is an action for refund of taxes and interest paid for the year 1968, the issues presented involve items on plaintiff's 1971 income tax return.

4. Plaintiff Security Benefit is, and at all times relevant was, a corporation organized and existing under the laws of the State of Kansas as a mutual life insurance company, engaged in the business of writing various forms of life insurance, annuities and accident and health insurance.

5. The plaintiff is, and at all times relevant was, a life insurance company as

defined by 26 U.S.C. § 801(a), and was therefore subject to the Internal Revenue Code's provisions regarding taxation of life insurance companies, 26 U.S.C. §§ 801–820.

6. Plaintiff is also, and was at all times relevant, subject to regulation by the Kansas Insurance Department.

7. Plaintiff timely filed its 1968 Federal income tax return, reporting a liability thereon of $718,450. Plaintiff paid this amount, but upon audit the Internal Revenue Service determined the correct tax to be $697,509, and refunded to plaintiff the $20,941 overpayment.

8. Plaintiff timely filed its 1971 Federal income tax return, reporting taxable investment income of $1,937,096, and a loss from operations of $2,679,881.

9. In July, 1972, plaintiff timely filed a Form 1139—an Application for Tentative Refund from Carryback, wherein the 1971 operations loss of $2,679,881 was treated as an operations loss carryback to 1968, resulting in a tax refund of $465,174 for the year 1968.

10. Plaintiff's 1971 tax return was examined by the I.R.S., and an April 22, 1974 report determined that plaintiff's allowable 1971 operations loss was $918,971, rather than the $2,679,881 claimed by plaintiff. The report also determined that this reduction in plaintiff's claimed 1971 operations loss resulted in (a) a reduction of the 1971 loss carryback to 1968, (b) an increase in plaintiff's 1968 tax liability to $528,017, rather than the $232,335 reported, and (c) a 1968 tax deficiency of $295,682.

11. On January 27, 1975, plaintiff and the I.R.S. timely entered into a Form 872–A Agreement, Special Consent Fixing Period of Limitation Upon Assessment of Income Tax, extending the statute of limitations for assessments that could result from adjustments to plaintiff's 1971 Federal income tax return.

12. Plaintiff received a Statutory Notice of Deficiency from the I.R.S. proposing a 1968 tax deficiency of $295,682 on the basis that plaintiff understated income it received in 1971 from the Ladies' Society of the Brotherhood of Locomotive Firemen and Enginemen.

13. Plaintiff paid the 1968 tax deficiency and the attributable interest.

14. On December 23, 1976, plaintiff Security Benefit timely filed a claim for refund (Form 1120X) for 1968, seeking a recovery of tax in the amount of $528,017, together with assessed interest and statutory interest.

15. By examination report dated March 24, 1977, the I.R.S. (a) increased plaintiff's 1971 loss from operations from $918,971, as previously determined to $1,053,082, (b) increased plaintiff's 1971 operations loss carryback to 1968 by $134,111, and (c) decreased plaintiff's 1968 dividend deduction by $134,111 from $1,450,905 to $1,316,794. These adjustments, which reflect an I.R.S. concession on an issue not here in dispute, did not affect plaintiff's 1968 tax liability.

16. In this action, plaintiff claims that the 1971 loss from operations was greater than the $2,679,881 reported on its 1971 return, and, as stated above, seeks a refund of the entire $528,017 paid for the year 1968, plus interest.

*INTRODUCTORY LEGAL DISCUSSION*

Before reaching the three major issues of the case, we deem it appropriate to briefly discuss a few facets of the income taxation of insurance companies. The Supreme Court has referred to the pertinent laws and regulations as "the complex portion of the Internal Revenue Code concerning life insurance companies." *Commissioner v. Standard Life & Accident Insurance Co.,* supra, 433 U.S. at 149, 97 S.Ct. at 2524. Although much of what we outline in this section will be repeated below, a brief overview of the law, including lengthy quotations from two clear and helpful opinions, should assist an understanding of the complicated legal issues involved.

As a life insurance company, plaintiff SBL is taxable under 26 U.S.C. §§ 801–820, which codify the Life Insurance Income Tax Act of 1959.

"[L]ife insurance company taxable income" is defined in 26 U.S.C. § 802(b) as the sum of—

(1) the taxable investment income (as defined in 26 U.S.C. § 804) or, if smaller, the gain from operations (as defined in section 809),

(2) if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess, plus

(3) the amount subtracted from the policy-holders surplus account for the taxable year, as determined under section 815.

The third subsection of § 802(b) is not applicable to a mutual company such as plaintiff.

Life insurance companies are taxed in a three phase system, about which quite a bit of expert testimony was presented at trial. In *Reserve Life Ins. Co. v. United States*, 45 A.F.T.R.2d 80–893 (Ct.Cl.1980), the court explained:

Phase I imposes a tax at the full corporate rate on the lesser of: (1) the insurance company's taxable investment income (i. e., the portion of the net investment income actually earned which exceeds the amount of investment income needed to meet future policy obligations to policyholders); or (2) the company's gain from operations (i. e., the excess of income over expenses).

If the company's gain from operations is greater than the company's taxable investment income, the company pays a full corporate tax on the taxable investment income and also pays, as phase II, a full corporate tax on one-half of the amount by which the gain from operations exceeds the taxable investment income.

In a situation where the company's gain from operations exceeds the taxable investment income, the one-half of the difference that escapes phase II taxation is put in a special account and accumulated on the tax records. If the company decides later on to use this money, it is then taxed at the full corporate rate as phase III.

The first two major issues in this case involve an assumption reinsurance transaction whereby SBL, the reinsurer, assumed liability on policies originally issued by the Society, the reinsured. The background concepts necessary to evaluation of an assumption reinsurance transaction were broadly sketched in the following passage from *Mutual Savings Life Ins. Co. v. United States*, 488 F.2d 1142, 1143–1144 (5th Cir. 1974):

As premiums on policies are received by a life insurance company, state insurance laws require a portion of the premiums to be set aside as reserves for the payment of claims. Premium receipts must be reported as income, but to avoid taxing the company on that portion of the premium receipts allocated to reserve requirements, the Act provides that amounts by which reserves are increased may be deducted from current operating income. Concomitantly, when a policy is paid on the death of the insured so that reserves are decreased and the reserved assets are freed for the company's general use, the amount of decrease must be reported as income for tax purposes.

In addition to basic transactions in which an insurance company issues a life insurance policy to an individual, collects premiums, sets aside in reserves a portion of each premium during the life of the policy holder, and then pays the face of the policy upon the insured's death permitting a reduction in reserve requirements, insurance companies reinsure themselves. In such reinsurance transactions, one company transfers a policy to another company, the "reinsurer," which then is entitled to receive the insurance premiums as paid, maintains appropriate statutory reserves, and pays the death benefits when the policyholder dies. Usually large numbers of policies are involved and often they have been in force for a period of time so that substantial amounts of reserves are being held against the policies at the time of the transfer.

*The Reinsured.* In reinsurance transactions, the company which assigns the policies, the "reinsured," can legally reduce its reserves by the amount required to be held in reserve on the assigned policies, but this amount must be reported as income. If any consideration is paid by the reinsured to the reinsurer for assumption of the policy liabilities, the reinsured is entitled to deduct this amount from income. In some cases, the reinsured may receive consideration from the reinsuring company, and such consideration must then be included as income.

*The Reinsurer.* On the other hand, the reinsurer, upon acquiring the policies, must commensurately increase its required reserves, but may immediately deduct this amount from income. Any consideration received from the reinsured must be reported by the reinsurer as income. But if the reinsurer has paid consideration for the policies, the payment cannot immediately be deducted, but must be amortized over the estimated life of the contracts.

When the reinsurer receives consideration in the exact amount of the required reserves, these payments obviously offset each other. The reinsured company reports as income the amount by which its reserves may now be reduced, but deducts the identical amount which it has paid to the reinsurer. The reinsuring company reports as income the amount paid it by the reinsured, but deducts from income the same amount by which its reserves have been increased.

The third issue in the case involves an understanding of the Supreme Court's decision in *Commissioner v. Standard Life & Accident Ins. Co., supra.* To comprehend the issues involved, one must have a passing familiarity with a number of life insurance terms and basic concepts. These were discussed in relatively clear terms in *Reserve Life Ins. Co. v. United States, supra,* 45 A.F.T.R.2d at 80-893 to 80-895:

A life insurance contract is a contract under which the insurance company agrees with a person to assume certain risks related to life and death. The insurance company charges the policyholder annually and agreed price, known as the "gross premium," for assuming and carrying the risks involved in the policy.

The gross premium is composed of two parts, i. e., the "net valuation premium" and the "loading."

The "net valuation premium" on a particular policy means the amount of money that, using the mortality table and the interest rate assumed for the policy, will be sufficient to provide for the payment of the benefits promised in the policy. The net valuation premium is added to the policy reserve each year in order that the company may be able to satisfy future claims under the policy and to provide current policy benefits.

The "loading" portion is the part of the gross premium from which the company's deductible expenses (e. g., overhead, salesmen's commissions state taxes, etc.) are paid. The loading represents the difference between the gross premium and the net valuation premium.

Although premiums on ordinary life insurance are typically calculated and quoted on an annual basis, policyholders often pay premiums on an installment plan (e. g., semiannually, quarterly, or monthly). "Deferred premiums" are installments which remain to be paid after the end of the insurance company's tax year on December 31 and before the next annual renewal dates (i. e., the anniversary dates) of the respective policies.

"Uncollected premiums" are premiums which, at the close of December 31 each year, are already due but have not been paid, and which relate to insurance policies that are still in effect under grace-period provisions.

The term "unpaid premiums" is sometimes used in the life insurance industry to include both deferred premiums and uncollected premiums.

There is no obligation—contractual or otherwise—on the part of the policyholders to pay to the insurance company either deferred or uncollected premiums.

If, however, a policyholder does not pay a premium in conformity with the provisions of the policy, the policy lapses upon the expiration of a grace period.

Life insurance "reserves" are not trust funds or particular assets in escrow. They are merely statements of liability reflecting a life insurance company's benefit obligations to its policyholders. The reserve simply operates as a charge on so much of an insurance company's assets as must be maintained in order for the company to be able to meet its future commitments under the policies it has issued.

In the United States, reserves are computed on a net premium basis. The three basic elements affecting a life insurance reserve are: (1) the mortality tables utilized; (2) the interest rate utilized; and (3) the valuation method utilized. The mortality tables are usually prescribed, and the interest rate is usually regulated, by state law.

With respect to the third element, i. e., the valuation method, there are two basic valuation methods used by insurance companies: (1) "the net level premium" method; and (2) a "preliminary term" method. If the mortality table and assumed rate of interest are the same, the basic difference between the net level premium method and a preliminary term method is in the uniformity of the net valuation premiums under the net level method for all policy years, including the first. The net level premium method assumes uniform net valuation premiums for all years throughout the premium-paying period of an insurance policy. On the other hand, a preliminary term method assumes a smaller net valuation premium in the policy's first year of existence when the company's expenses in connection with the policy are greater—than in all subsequent policy years, in which larger and uniform net valuation premiums are assumed. The first-year net valuation premium assumed by a preliminary term method is less than—and the net valuation premiums in the second and subsequent years are greater than—the uniform net valuation premiums assumed by the net level premium method.

A gross deferred or uncollected premium is equal to the net valuation portion of the deferred or uncollected premium plus the loading portion thereof.

The components of each gross deferred or uncollected premium (i. e., the net valuation premium and the loading), as reported in the company's Annual Statement, necessarily differ, depending upon whether the Annual Statement reserve is computed under a preliminary term method or under the net level premium method. Utilization (with the same assumed interest and mortality factors) of a preliminary term method, rather than the net level premium method, in computing Annual Statement reserves would result in a smaller net valuation premium and increased loading only for the first year of each life insurance policy, and would result in larger net valuation premiums and reduced loading for all but the first year of each life insurance policy.

Because a life insurance company's "mix" of business is usually such that first-year premiums tend to be dominant over renewal premiums, the preliminary term method of valuing reserves (which maximizes the loading portion and minimizes the net valuation portion of first-year gross premiums) generally has income tax advantages over the net level premium method. This is especially true with respect to deferred and uncollected first-year premiums, since the Supreme Court determined in *Commissioner v. Life & Accident Insurance Co.*, supra, 433 U.S. at 151 [97 S.Ct. at 2525], that only the net valuation portions—and not the loading portions—of unpaid premiums are required to be included in a life insurance company's assets and gross premium income, as well as in its reserves, for the purpose of computing the company's federal income tax liability.

With the background statement of facts and the preliminary discussion of the legal concepts now set forth, we turn to a discussion of the three major issues presented by this case.

ISSUE NUMBER ONE: DID PLAINTIFF PROPERLY REPORT THE CONSIDERATION IT RECEIVED FOR PROVIDING BENEFITS TO MEMBERS OF A FRATERNAL ORGANIZATION, IN FILING ITS 1971 INCOME TAX RETURN?

*FINDINGS OF FACT*

1. The Ladies Society of the Brotherhood of Locomotive Firemen and Enginemen is a fraternal benefit society which provided insurance benefits to its members. These benefits consisted of life insurance benefits and funeral benefits. The premiums charged by the Society in 1971 were $12 per year per $1,000 of life insurance benefits. The funeral benefits constituted less than two percent of the total insurance program.

2. Under the Society's constitution, members who were under the age of 50 could apply for life insurance benefits of $200 or $500, and members who were under the age of 45 could apply for life insurance benefits of $1,000. Approximately 70% of the Society's members were age 37 or less when they commenced insurance coverage and more than 96% were age 46 or less.

3. The only assets held by the Society in 1970 for the payment of insurance benefits were those in its insurance funds. The only source of funds for the assets maintained as part of the insurance funds were the assessments from the Society members, plus income earned thereon.

4. The insurance funds were the Society's only reserves for meeting its insurance liabilities. The Society did not estimate or compute reserves on the traditional basis of mortality tables and assumed rates of interest.

5. No state insurance department exercised regulatory jurisdiction over the Society's insurance activities.

6. As of July 1, 1971, the assets in the Society's insurance funds consisted of cash, bonds, and real estate interests. The bonds were considered to be high quality, but had substantially decreased in market value from the time they were purchased by the Society. As of July 1, 1971, the par value of the bonds was $7,569,000 and the fair market value was $5,543,110.

7. The par value of the bonds closely approximated the purchase price paid for such bonds by the society. The par value also approximated an amount equal to the accumulation of past assessments, plus interest, less claims, expenses, and small amounts transferred to other accounts.

8. In December of 1967, Nelson and Warren, a firm of consulting actuaries, analyzed the Society's insurance fund. The analysis revealed that since 1960 claims had been continuously increasing while total assessments had been continuously decreasing. In spite of this trend, it was concluded that the fund was financially sound and that the $12 assessments, plus the assets in the insurance fund, would be adequate to cover operating expenses and pay death benefits. The study noted, however, that the fund showed some symptoms of an "assessment spiral" and that if the trends became more unfavorable the Society should take remedial action.

9. The trend toward an assessment spiral continued. So, in 1970, the Society's officers decided to look for acceptable insurance for its members as a substitute for the Society's benefits.

10. Plaintiff received a July 7, 1970 letter from Marian Koger, grand president of the Society, in which she asked if the plaintiff would be interested in providing this coverage. The letter informed plaintiff that the business was solvent and in good financial condition.

11. Robert E. Jacoby, SBL's vice-president in charge of reinsurance, had the responsibility to determine if it would be advisable for the plaintiff to acquire this business. By letter dated July 27, 1970, Mr. Jacoby responded to Mrs. Koger's letter, telling her that the plaintiff was interested in exploring the matter further, but that more information was needed.

12. Jacoby began gathering information for his actuaries to determine what annual premiums would be required so that the

premiums, together with the assets to be transferred from the Society, would be adequate to meet death claims. One of the actuaries, Steve Cooper, concluded that a $12 premium would produce a "surplus strain," whereas age-banded premiums of $12, $15, and $18 would produce a "surplus gain." Other research indicated that approximately 75% of the insured members of the Society were between 50 and 80 years old.

13. On September 3, 1970, Jacoby wrote Mrs. Koger to make a tentative offer. One of the terms of the proposed offer was that the assessment rates would be increased from a straight $12 per thousand to age-banded rates of $12, $15, and $18.

14. This offer was made contingent on State approval for valuation of the insurance fund bonds at par because there would be a substantial surplus strain if the bonds were carried on the Annual Statement at a transfer date fair market value. Jacoby sent a letter to the Kansas Insurance Commissioner in which he indicated that plaintiff would be willing to assume the Society's liabilities if permitted to carry the bonds to be received from the Society at par rather than at fair market value for Annual Statement purposes.

15. The Society rejected the concept of age-banded premiums, apparently because of the heavier burden it placed on older members. Further negotiations occurred, and it was agreed that a straight premium of $15 per $1,000 of life insurance benefits and $30 per $1,000 of funeral benefits would be appropriate. On December 21, 1970, Jacoby sent a copy of a proposed agreement to the Kansas Commissioner of Insurance. Tentative approval was given by the Commissioner on January 5, 1971, and on February 3, 1971, permission was given to plaintiff to carry the securities to be received from the Society at par.

16. In February, 1971, each insured member of the Society was sent an explanation of the proposed agreement and a ballot upon which to vote acceptance or nonacceptance. The agreement was accepted.

17. The agreement was executed on May 1, 1971, and was approved by the Commissioner of Insurance on May 19, 1971.

18. The agreement was effective as of July 1, 1971. On that date, the premium was raised from $12 to $15 per thousand dollars of coverage. Plaintiff issued assumption certificates to the Society members which provided that the insurance benefits were not subject to cancellation except for nonpayment of premiums.

19. Also on July 1, 1971, the Society transferred to plaintiff cash in the amount of $70,436.67, real property with a fair market value of $330,267.35, and securities with a total fair market value of $5,543,110, for a total of $5,943,814. The par value of the securities was $7,487,380. When the securities are valued at par, the total amount of assets transferred was $7,888,084.02. The Society did not transfer, nor did it agree to transfer, any other assets to plaintiff. The assets transferred constituted almost all of the Society's assets.

20. Plaintiff did not agree to pay a commission or bonus for the insurance business it acquired from the Society.

21. In the negotiations, the parties did not place a value on the insurance business or contracts which plaintiff acquired. If such business or contracts had an ascertainable value, it was not taken into account as consideration by the parties to the transaction.

22. Jacoby and Cooper both anticipated that the acquisition of this block of business from the Society would be profitable for the plaintiff in the long run.

23. Mean reserves of $7,554,519 attributable to plaintiff's liabilities to the members of the Society were included as part of an $11,236,157 amount reported by plaintiff in its 1971 Annual Statement as reserves for life policies and contracts.

24. The $7,554,519 mean reserve included in plaintiff's 1971 Annual Statement was computed using the 1958 C.S.O. table, a recognized mortality table within the meaning of 26 U.S.C. § 801(b)(1)(A), and a 3½% assumed rate of interest. This reserve was

reported as part of plaintiff's overall reserve on its 1971 income tax return.

25. The $7,554,519 reserve was a reserve set aside by plaintiff to satisfy future unaccrued claims arising from life insurance contracts involving life contingencies. Such reserve was required by law.

26. In computing the reserve, the company actuary, Cooper, did not have information regarding the initial issue dates of the certificates or policies to the members of the Society or the ages of the members at the date of issue.

27. In computing the initial reserve component of the Annual Statement reserve, the company actuary in effect determined the present value of future benefits as of July 1, 1971, using the 1958 C.S.O. table and an assumed rate of interest of 3½ % and then reduced this amount by the present value of annual net premiums of $15 per thousand to be received subsequent to July 1, 1971 for each contract where an insured had an attained age of 38 and a lesser annual net premium where an insured had not attained the age of 38.

28. An annual net premium of $15 per thousand of insurance in force or less was a reasonable assumption, according to expert testimony. The $15 annual net premium yielded an initial reserve which was a close approximation of, although less than, the carrying value of the assets transferred by the Society. Further, if the mean reserve were computed on the basis of precise data now known using the mortality table and interest assumptions used by plaintiff, the reserve would have closely approximated the mean reserve calculated by plaintiff, and it would have qualified as a life insurance reserve under the provisions of Subchapter L.

29. To minimize surplus strain, plaintiff estimated the reserve using the least conservative assumptions available under Kansas law. Actuary Cooper utilized 3½% as the interest rate—the maximum allowed by Kansas law. Had a lesser interest rate been assumed, the reserve calculated would have been even larger.

30. Actuaries are permitted discretion by State insurance authorities in the assumptions they can make in estimating or computing reserves. In its examination of the company, the Kansas Insurance Department did not dispute the propriety of any of the standards adopted or any of the assumptions made by plaintiff in reporting the transaction with the Society.

31. An assumption reinsurance transaction is an arrangement whereby an insurance company, referred to as the reinsurer or the reinsuring company, becomes solely liable on contracts which it did not issue. In effect, a reinsurer steps into the shoes of a ceding or reinsured company and is substituted for such company where thereby is relieved from its liability. The agreement between plaintiff and the Society was an assumption reinsurance transaction.

32. Where a reinsurer in an assumption reinsurance transaction becomes solely liable to policyholders on a block of contracts transferred to it, it generally receives consideration from the ceding company (the reinsured) for its assumption of the latter company's liabilities.

33. The reinsurer computes its reserves on the assumed contracts by reference to the ceding company's issue dates and the age at issue rather than the attained age of the individuals insured.

34. Sometimes the reinsurer may agree to pay a certain amount to the ceding company as a commission, or as reimbursement for unrecovered expenses that such company may have incurred in placing the business on the books or as the value of the insurance in force assumed by the reinsurer. Where each company in an assumption reinsurance transaction agrees to make a payment to the other, the company with the greater obligation may pay the other a *net* amount rather than have an exchange of checks by the transacting parties. While only one payment is made, each of the contracting parties has agreed to make a payment to the other in this type of "netting transaction."

35. The agreement between plaintiff and the Society was not a "netting transaction."

DISCUSSION OF LAW

(A) *Introduction*

Following its transaction with the Society, plaintiff reported as income arising out of the transaction a total of $5,943,814. This figure is the total of cash ($70,436.67), real property ($330,267.35) and securities ($5,543,110 market exchange value) received. It is defendant's view that plaintiff should have reported, as compensation received in the transaction, $7,554,519—an amount equal to the reserves it established.

The difference of opinion between the parties as to what amount should have been reported as income on plaintiff's 1971 tax return arises from a difference of opinion as to the definition of "compensation" in 26 U.S.C. § 809(c)(1). The parties agree that when, as in the transaction between plaintiff and the Society, a reinsurer assumes the insurance obligations of another entity, it must report as income all "consideration" which it received from the reinsured. § 809(c)(1) states that the following shall be taken into account in determining gain or loss from operations:

> The gross amount of premiums and other consideration (*including* advance premiums, deposits, fees, assessments, and *consideration in respect of assuming liabilities under contracts not issued by the taxpayer*) on insurance and annuity contracts (including contracts supplementary thereto); less return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums. (emphasis added)

The difference of opinion as to what constitutes "consideration", in turn, arises from a dispute as to whether this transaction is governed by the I.R.S. regulations in effect in 1971, or by those same regulations as amended in 1976. Plaintiff argues that the transaction should be controlled by the regulations which were in effect in 1971. Defendant argues that the regulations were amended in 1976 to correct previous errors and that the corrected regulations should control.

Plaintiff contends, and defendant does not dispute, that SBL's 1971 tax return was completed in conformity with the regulations in effect at that time. § 1.817–4(d)(1) of the 1971 regulations provided, generally, that assumption reinsurance "shall be subject to the provisions of sections 806(a) [governing certain changes in reserves and assets] and 809 and the regulations thereunder."

More specifically, § 1.817–4(d)(2)(ii) read as follows in 1971:

> In connection with an assumption reinsurance (as defined in paragraph (a)(7)(ii) of § 8.809–5) transaction, a reinsurer shall in any taxable year beginning after December 31, 1957—
>
> (a) Treat the consideration received from the reinsured in any such taxable year as an item of gross amount under section 809(c)(1), and
>
> (b) Treat any amount paid to the reinsured, to the extent such amount meets the requirements of section 162, as a deferred expense under section 809(d)(12) and amortize such amount over the reasonably estimated life (as defined in subdivision (iii) of this subparagraph) of the contracts reinsured, irrespective of the taxable year in which such amount was paid to the reinsurer.

The 1971 version of § 1.817–4(d)(3) contained four examples to provide guidance to taxpayers attempting to discover the income tax consequences of their reinsurance transactions. Example (1) is virtually indistinguishable from the case at hand:

> Example (1). On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts

reinsured by X were $100,000. Under the reinsurance agreement, X agreed to pay Y a consideration of $75,000 in cash for assuming such contracts. Assuming no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under section 809(c)(2) as a result of this net decrease in its reserves and a deduction of $75,000 under section 809(d)(7) for the amount of the consideration paid to Y for assuming these contracts. Y has income of $75,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in its reserves.

If the Society and SBL were substituted for X and Y, respectively, and the figures relevant to the transaction in this case were also substituted, Example (1) would read as follows:

On July 1, 1971, Society, a fraternal organization providing life insurance benefits to its members, reinsured its insurance contracts with SBL, a life insurance company, under an agreement whereby SBL agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by Society were $7,554,519. Under the reinsurance agreement, Society agreed to pay SBL a consideration of $5,543,110 in cash and other tangible property for assuming such contracts. Assuming no other insurance transactions by Society or SBL during the taxable year, and assuming that Society and SBL compute the reserves on the contracts reinsured on the same basis, Society has income of $7,554,519 under section 809(c)(2) as a result of this net decrease in its reserves and a deduction of $5,543,110 under section 809(d)(7) for the amount of the consideration paid to SBL for assuming these contracts. *SBL has income of $5,543,110 under section 809(c)(1) as a result of the consideration received from Society and a deduction of $7,554,159 under section 809(d)(2) for the net increase in its reserves.*

Plaintiff computed its 1971 income tax in conformity with Example (1). This computation was also consistent with Example (4) of the 1971 regulations [which is now Example (5) of the 1976 regulations]:

On August 1, 1960, R, a life insurance company, reinsured all of its insurance policies with S, a life insurance company, under an agreement whereby S agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by R were $3,000,000. Under the reinsurance agreement, R agreed to pay S a consideration of $3,000,000 *in stocks and bonds* for assuming such contracts. Assuming no other insurance transactions by R or S during the taxable year, that R and S compute the reserves on the contracts reinsured on the same basis, and that R has a recognized gain (after the application of the limitation of section 817(b)(1)) of $20,000 due to appreciation in value of the assets transferred, the results to each company are as follows:

INCOME

| Company R (reinsured) | Company S (reinsurer) |
|---|---|
| Net decrease in reserves (sec. 809(d)(2)) .....$3,000,000 | Consideration received by S in respect of |
| Capital gain as limited by sec. 817(d)(1) to be taxed separately under sec. 802(a)(2) ....... 20,000 | assuming liabilities under contracts issued by R (sec. 809(c)(1) .....$3,000,000 |

DEDUCTIONS

| Company R (reinsured) | Company S (reinsurer) |
|---|---|
| Consideration paid by R to S in respect of S's assuming liabilities under contracts issued by R (sec. 809(d)(7)) ..$3,000,000 | Net increase in reserves (sec. 809(d)(2)) .....$3,000,000 |

SBL points out that § 1.817–4(d)(3) and Example (1) were applied in a manner completely consistent with SBL's 1971 return in *Mutual Savings Life Ins. Co. v. United States*, 488 F.2d 1142 (5th Cir. 1974), a case worthy of some discussion.

*Mutual Savings* was a tax refund suit involving a life insurance company's acquisition of two blocks of life insurance policies from other insurance companies in reinsurance transactions. The two reinsured companies involved were Georgia Life and

Health Insurance Company and the Life Insurance Company of Florida. In the Georgia Life transaction, as here, the reinsured paid consideration to the taxpayer in an amount less than the required reserves. In Florida Life transaction, the taxpayer not only received no payment from the reinsured, but actually paid a substantial sum to it for the policies. The heart of the lawsuit was the meaning of the phrase "consideration received from the reinsured" in § 1.817–4(d)(2)(ii). Mutual Savings argued that the phrase encompassed only tangible assets labeled by the parties as consideration. The Government argued, as here, that the total consideration included not only tangible assets transferred but also the *intangible value* of the insurance contracts themselves. The Government's position was rejected, and Mutual Savings prevailed in the action.

Regarding the transaction with Georgia Life, as indicated above, the reinsured obtained policies for which the legally required reserves exceeded the tangible assets received from the reinsured:

In the first transaction, taxpayer acquired from Georgia Life and Health Insurance Company life insurance policies for which the legal required reserves were $1,047,142. Taxpayer received from Georgia Life $682,990 in tangible assets. Mutual Life was required to increase its reserves by $1,047,142, which is $364,152 in excess of the value of the tangible assets received.

The District Court held that Mutual was entitled to deduct $1,047,142 for the increase in its life insurance reserves and was required to report as income the $682,990 consideration received from Georgia Life. The net effect, therefore, was to allow the taxpayer a $364,152 excess of deductions over reported income on the transaction.

The Government contends that the "difference between the obligations assumed ($1,047,142) and the tangible assets received ($682,990) represents the payment ($364,152) taxpayer made to Georgia Life for the privilege of taking over this block of business" and that this pay-

ment may only be amortized over the useful life of the contracts. [488 F.2d at 1145]

A comparison between the facts of this case and the specifics of the Georgia Life transaction in *Mutual Savings* indicates near identity. The Government's position regarding the taxability of the transaction is also the same. In *Mutual Savings,* the court quoted Example (1) from § 1.817–4(d)(3) and utilized it as a basis for rejecting the Government's view, stating:

The Government contends that this example does not properly reflect the law in that the phrase "consideration received from the reinsured," Treasury Regulations, *supra,* applies not only to tangible assets paid to the taxpayer by the reinsured, but also to the intangible asset value of the acquired life insurance policies. In this example, however, only the tangible consideration transferred between the parties is shown to be considered.

A taxpayer has the right to rely upon the Government's Regulations and their published illustrations. Treasury Regulations having the force and effect of law are binding on tax officials, as well as taxpayers. *See Pacific Nat'l Bank of Seattle v. Comm'r of Internal Revenue,* 91 F.2d 103 (9th Cir. 1937).

As stated by the trial court in its decision from the bench, "the Government cannot just abandon example 1 of the regulations and direct it into some type of obscurity oblivion as if it never existed, whereas the parties do and can fit in that direct pattern. Until the regulation is changed, the Government is obligated to follow it."

We find no error in the District Court's decision regarding the Georgia Life transaction. [488 F.2d at 1145–1146]

The Florida Life transaction in the *Mutual Savings* case was not so directly analogous factually; nonetheless, the court's discussion of its tax treatment, which stressed that only tangible transfers are taken into consideration in determining compensation, is worthy of note.

To repeat, if the regulations extant in 1971 as interpreted in Example (1) and as applied in *Mutual Savings* control our decision in this case, plaintiff properly filed its 1971 tax return.

Although the Government's position was completely rejected in *Mutual Savings*, it was generally accepted in a similar case decided about the same time, *Kentucky Central Life Ins. Co. v. C. I. R.*, 57 T.C. 482 (1972). In *Kentucky Central*, the taxpayer was the reinsurer which assumed the liability on a block of policies known as the Skyland policies originally issued by the reinsured, Guaranty Savings Life Insurance Company. Under the reinsurance agreement, the purchase price was $1,800,000. Of this, $1,650,000 was for the Skyland policies, their agreed value as gauged by the present value of the future profits to be derived from the policies involved. Rather than pay the $1,650,000 to Guaranty, Kentucky Central was given a credit by Guaranty in the overall transaction. In reporting its compensation, Kentucky Central listed as consideration the tangible assets it had received, but not the $1,650,000 credit.

The court viewed the basic issue as whether an amount equivalent to the value of the insurance business received by petitioner in the assumption reinsurance transaction with Guaranty should be included in premium income within the purview of § 809(c)(1) in determining gain from operations. The taxpayer claimed the only consideration it received was $310,398.11 in premium income. The I.R.S. claimed that the taxpayer had assumed reserves of $1,960,398.11 and received in return consideration in the same amount. The difference between the two figures was the $1,650,000 value placed on the insurance business reinsured and received by the taxpayer from Guaranty by the terms of the agreement.

The court noted that, assuming a bona fide arm's-length transaction, it was reasonable to believe that each party had received consideration equal to the value it bestowed upon the other. The court felt that had the transaction been handled without the use of credits, on a strictly cash basis, the taxpayer would have paid Guaranty $1,800,000 cash in return for the tangible assets and insurance contracts purchased and also for the required reserves previously accumulated from premiums.

In holding for the government, the court stated:

As the sale worked out, taxpayer succeeded in making the purchase of the Skyland business without having to transfer any sizable amounts of cash or other assets as consideration for its new acquisitions. Additionally, Kentucky Central has attempted to avail itself of the deduction created by section 809(d)(2), for increasing its reserves as part of the sale, without recognizing, coincidently, the consideration it received from Guaranty in the form of credits for the reserves. Should petitioner's argument prevail, we would, in effect, be allowing it a current loss deduction for $1,650,000 of the purchase price it indirectly paid Guaranty. Such could not have been the intendment of section 809 when enacted by Congress.

Although the court found little assistance in the legislative history of the relevant congressional acts, it found the taxpayer's position inconsistent with its view of congressional intent:

To allow petitioner the benefit of the section 809(d)(2) deduction for the increase in its reserves necessitated by the sale transaction, without also imputing premium income to it under section 809(c)(1) for the credit it received on the purchase price of the Skyland business, would produce a gross distortion in taxpayer's income, a windfall tax benefit, which is not in keeping with the purpose of subchapter L. Furthermore, this Court has previously dealt with the assumption of liabilities in an insurance setting and imputed income to petitioner from a reinsurance agreement. *International Life Insurance Co.*, 51 T.C. 765 (1969). Although that case may be distinguishable from the instant case on its facts, the basic rationale of the decision is

nevertheless applicable. Therefore, we are firmly convinced that Congress intended the phrase, "and consideration in respect of assuming liabilities under contracts not issued by the taxpayer," in section 809(c)(1) to serve as a catchall for transactions such as the one here.

In *Kentucky Central*, the taxpayer placed reliance upon Example (1) of § 1.187–4(d)(3). Unlike the court in *Mutual Savings*, the court in *Kentucky Central* rejected example one as controlling:

> Because in the example no amount was included in the reinsurer's income for the value of the insurance business transferred, petitioner claims no amount should be included in its income for the value of the business it received in this transaction. We are not impressed with the argument for two reasons. In the first place, we are not concerned with the value of the insurance business ceded *per se*. We are concerned with an *amount* equivalent to the value of the business, but only because that is the amount taxpayer failed to report as income. Another reason we are unpersuaded by petitioner's analogy is that the example in the regulations does not give enough of the relevant facts and is thus misleading. The example leaves us uninformed as to what value was placed on the reinsured business and whether the reserves for the policies were transferred in the transaction. It seems logical to assume the only reason the reinsured would pay the reinsurer the $75,000 in cash would be to establish the required reserves for the policies ceded, but we will not make such an assumption on the facts as presented in the example. Furthermore, the result reached by the example and the preceding regulations can be read to support respondent's position if we decide that section 809(c)(1) consideration includes credits given a reinsurer for liabilities it assumes in a reinsurance transaction.

For these reasons, we hold that petitioner received $1,650,000 additional consideration which is taxable to it as premium income under section 809(c)(1), from its reinsurance of Guaranty's Skyland division business.

In light of the conflict in the *Kentucky Central* and *Mutual Savings* cases, and no doubt upset that its position was rejected in the latter case, the I.R.S. set about to amend the pertinent regulations. Regulation § 1.817–4(d)(2), as amended in 1976, now reads as follows:

> (iii) ... where the reinsured transfers to the reinsurer in connection with the assumption reinsurance transaction a *net* amount which is less than the increase in the reinsurer's reserves resulting from the transaction, the reinsurer shall be treated as—
>
> (A) Having received from the reinsured consideration in an amount equal to the net amount of the increase in the reinsurer's reserves resulting from the transaction, and
>
> (B) Having paid the reinsured an amount for the purchase of the contracts equal to the excess of the amount of such increase in the reinsurer's reserves over the net amount received from the reinsured.

Accompanying the new regulations is a modified version of Example (1) which now provides:

> Example (1). On June 30, 1959, X a life insurance company reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and to become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement X agreed to pay Y $100,000 for assuming such contracts *and Y agreed to pay X $17,000 for the right to receive future premium payments under this block of contracts. Rather than exchange payments of money, X agreed to pay a net amount of $83,000 in cash.* Assuming that the reasonably estimated life of the contracts reinsured is 17 years, that there are no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the

same basis, X has income of $100,000 under section 809(c)(2) as a result of the net decrease in its reserves. X has a net deduction of $83,000 ($100,000 − $17,000) under section 809(d)(7). For the taxable year 1959, Y has income of $100,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in reserves and $1,000 ($17,000 divided by 17, the reasonably estimated life of the contracts reinsured), under section 809(d)(12). The remaining $16,000 shall be amortized over the next 16 succeeding taxable years (16 × $1,000 = $16,000) under section 809(d)(12) at the rate of $1,000 for each such taxable year. (emphasis added)

A new Example (3) was also issued which apparently illustrates the application of subdivision (2)(iii):

Example (3). The facts are the same as in Example (1), except that the reinsurance agreement *does not specifically provide* that X agreed to pay Y $100,000 for assuming the contracts reinsured and Y agreed to pay X $17,000 for the right to receive future premium payments under such contracts. Instead, X agreed to pay Y a net amount of $83,000 in cash for assuming such contracts. Nevertheless, Y is treated as having received from X consideration equal to $100,000, the amount of the increase in Y's reserves, and as having paid $17,000 ($100,000 less $83,000) for the purchase of such contracts. Therefore, for the taxable year 1959, Y has income of $100,000 under section 809(c)(1). Y also has a deduction of $100,000 under section 809(d)(2) for the net increase in its reserves and an amortization deduction under section 809(d)(12) of $1,000 ($17,000 divided by 17, the reasonably estimated life of the contracts reinsured). The remaining $16,000 shall be amortized by Y over the next 16 succeeding years. For 1959, X has income of the reasonably estimated life of the contracts $100,000 under section 809(c)(2) as a result of the net decrease in its reserves and a deduction of $83,000 under section 809(d)(7) for the net amount of considera-

tion paid to Y for assuming the contracts reinsured. (emphasis added)

It may be noted for purposes of future discussion that new Example (1) pertains to a transaction in which there is an explicit "netting" arrangement, whereas new Example (3) involves the imputation of income in the absence of such an explicit agreement.

Before discussing the real substance and application of the 1976 regulations, we must discuss their relevance to the case at hand. Plaintiff SBL argues that this case is controlled by the 1971 regulations, and that it would be unfair to retroactively apply the 1976 regulations. Defendant, on the other hand, argues that the 1976 regulations are retroactive in effect and do govern the filing of plaintiff's 1971 tax return.

(B) *Retroactivity of the 1976 Regulations*

■ The parties recognize that the I.R.S. has broad power to promulgate rules and regulations with retroactive application. A presumption of retroactivity arises from 26 U.S.C. § 7805(b) which provides:

The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

The background for this statute was described in some detail in *Wisconsin Nipple & Fabricating Corp. v. C.I.R.*, 581 F.2d 1235, 1237–1238 (7th Cir. 1978):

The explanation for the presumption in favor of retroactivity implied by this statutory language lies in the declaratory theory of jurisprudence on which the statute is predicated. The predecessor of § 7805(b), enacted in 1921, was in response to a proposal the Secretary of the Treasury had made in 1919. The provision was sought because administrative rulings were viewed as merely declaring what the statute had meant all along, and therefore necessarily retroactive, and it was thought the Secretary or his delegate should have power to grant relief from retroactivity in appropriate cases. *See Comment*, "Limits on Retroactive Deci-

sion Making by the Internal Revenue Service: Redefining Abuse of Discretion under Section 7805(b)," 23 U.C.L.A. L.Rev. 529, 532 (1976). Thus the Supreme Court has said that the provision "confirmed" the Commissioner's authority to make a ruling or regulation retroactive and "empowered him, in his discretion, to limit retroactive application to the extent necessary to avoid inequitable results." *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184, 77 S.Ct. 707, 710, 1 L.Ed.2d 746 (1957). The 1921 provision, after an amendment in 1928 to permit the Commission to relieve against retroactivity even when the different interpretation resulted from a court decision, has since been repeatedly reenacted without substantial change and survives today in § 7805(b). *See Comment, supra,* 23 U.C.L.A. L.Rev. at 432 n. 21; *cf. Dixon v. United States,* 381 U.S. 68, 71 n. 3, 85 S.Ct. 1301 [1303 n.3], 14 L.Ed.2d 223 (1965).

In light of this statutory history, the courts are almost unanimous in concluding that the Commissioner of the I.R.S. has broad authority to make his regulations retroactive. *Crown v. C.I.R.,* 585 F.2d 234, 241 (7th Cir. 1978); *United States v. Fenix and Scisson, Inc.,* 360 F.2d 260, 267 (10th Cir. 1966), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967). As Justice Brennan recently stated in his concurring opinion in *Central Illinois Public Serv. Co. v. United States,* 435 U.S. 21 at 33–34, 98 S.Ct. 917 at 923–924, 55 L.Ed.2d 82 (1978):

Those who administer the Internal Revenue Code unquestionably have broad authority to make tax rulings and regulations retroactive. See 26 U.S.C. § 7805(b), construed in *Dixon v. United States,* 381 U.S. 68 [85 S.Ct. 1301, 14 L.Ed.2d 223] (1965); *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180 [77 S.Ct. 707, 1 L.Ed.2d 746] (1957).

In the normal case retroactivity is presumed. *Anderson Clayton & Co. v. United States,* 562 F.2d 972, 979 (5th Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *Chock Full O'Nuts*

*Corp. v. United States,* 453 F.2d 300, 302–303 (2d Cir. 1971). Thus, it was recently stated in *Dunn v. United States,* 468 F.Supp. 991, 994 (S.D.N.Y.1979):

. . . the general rule is that, like judicial precedents, such rulings are to be accorded retroactive treatment absent some compelling reason to the contrary.

Although the authority of the I.R.S. to make its regulations retroactive is broadly construed, it is not without limit, as is pointed out in the concurring opinions of Justices Powell and Brennan in *Central Illinois Public Serv. Co. v. United States, supra,* 435 U.S. at 33–34, 38–39, 98 S.Ct. at 923–924, 926. The primary exception to the retroactivity rule occurs where the court finds that the Commission has abused its discretion. *Automobile Club of Michigan v. Commissioner, supra,* 353 U.S. at 185, 77 S.Ct. at 710; *Anderson, Clayton & Co. v. United States, supra,* 562 F.2d at 979; *Chock Full O'Nuts v. United States, supra,* 453 F.2d at 302.

The courts have not been especially generous in finding abuses of discretion. In Comment, *Limits on Retroactive Decision Making by the Internal Revenue Service: Redefining Abuse of Discretion Under Section 7805(b),* 23 U.C.L.A. L.Rev. 529, 534 (1976), it was stated:

. . . this doctrine of abuse of discretion has been invoked only in the few cases where the courts found the reliance justifiable and the detriment very severe.

Despite the fact that the I.R.S. generally invites the public to rely upon its published rulings [Rev.Proc. 72–1, 1972–1 C.B. 693, 694], the courts have generally found reliance justifiable only in cases of private rulings issued directly to a taxpayer. Comment, *supra,* 23 U.C.L.A. L.Rev. at n. 41. In so holding, the courts have generally rejected any arguments of quasi-estoppel. *Id.* at n. 28.

Certainly there have been cases reluctant to allow retroactive application of I.R.S. regulations in situations where the I.R.S. position was only recently made clear [*Crown v. C.I.R., supra,* 585 F.2d at 241], or where the tax is sought to be imposed with

respect to years prior to the date taxpayers are clearly put on notice of potential liability. *Central Illinois Pub. Serv. Co. v. United States, supra,* 435 U.S. at 38–39, 98 S.Ct. at 926 [Powell, J., concurring]. Nonetheless, as a general rule,

> ... the Commissioner has generally been permitted to revoke rulings retroactively even in extremely inequitable situations.

First, the courts have held that reliance cannot be predicated upon a published ruling or upon a private ruling issued to another person, limiting the doctrine thus far to private rulings issued to the taxpayer. Second, the courts have only considered the detriment to the individual taxpayer protesting the retroactive revocation and have not considered the detrimental effect of retroactive rulings on the public's confidence in government. Further, in determining the propriety of invoking the doctrine of abuse of discretion, the courts have not gone behind the Commissioner's decision and examined the reasons for the retroactive application. [Comment, *supra* 23 U.C.L.A. L.Rev. at 537–538]

The situations in which abuses of discretion have been found have been limited to a few fairly well defined categories. In *Anderson, Clayton & Co. v. United States, supra,* 562 F.2d at 981, the court stated:

> Courts have declined to give retroactive effect to regulations or rulings when [1] retroactivity would work a change in settled law relied on by the taxpayer and implicitly approved by Congress, *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 116, 59 S.Ct. 423 [426], 83 L.Ed. 536 (1939), [2] when it would lead to inequality of treatment between competitor taxpayers, *International Business Machines Corp. v. United States,* 343 F.2d 914, 170 Ct.Cl. 357 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966), or [3] when, in general, the result of retroactivity in a particular case would be unduly harsh, *see Woodward v. United States,* 322 F.Supp. 332, 335 (W.D.Va.) (dicta), *aff'd,* 445 F.2d 1406 (4th Cir. 1971).

*See also Wilson v. United States,* 588 F.2d 1168, 1172 (6th Cir. 1978); *Chock Full O'Nuts v. United States, supra,* 453 F.2d at n. 6; *Dunn v. United States, supra,* 468 F.Supp. at 994–995; and Comment, *supra,* 23 U.C.L.A. L.Rev. at n. 28.

█ In light of these categories, the Seventh Circuit in *Anderson, Clayton & Co. v. United States, supra,* 562 F.2d at 981, formulated four factors to be examined in determining whether the I.R.S. has abused its discretion in a particular case:

> From these cases we may distill a list of some of the considerations that are relevant to a court in reviewing the Secretary's exercise of his discretionary power to adopt retroactive regulations. That list includes: (1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law; (2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent code provisions; (3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and (4) whether according retroactive effect would produce an inordinately harsh result.

We shall examine these factors briefly.

(1) Whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters the law.

It is plaintiff's position that the 1976 regulations, as amended, change the previously applicable law. Defendant argues that the regulations are merely interpretive in nature and therefore are not truly changes in the law but only clarifications of what has been the law all along. As noted in *Anderson, Clayton & Co. v. United States, supra,* 562 F.2d at 985 n. 30:

> Strictly speaking, the question of retroactivity can arise only with respect to rules that are at least in part legislative in character. That is to say, to the ex-

tent a regulation merely interprets a statute, it in theory merely elucidates a meaning that has resided in the statute since its enactment. If an interpretative regulation merely clarifies what the language of the statute was intended to convey, it is ultimately misleading to term it retroactive. "It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L.Ed. 528, 532 (1936).

■ Defendant further argues that the 1971 version of the regulations, especially Example (1), was erroneous as a matter of law. It is clear that retroactive regulations may be used to correct errors of law. In *Dixon v. United States*, 381 U.S. 68, 72–73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965), the Supreme Court wrote:

> In *Automobile Club of Michigan v. Commissioner, supra* [353 U.S.], at 183–184 [77 S.Ct. at 709–710], we held that the Commissioner is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions. He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake. See *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129 [56 S.Ct. 397, 80 L.Ed. 528]. This principle is no more than a reflection of the fact that Congress, not the Commissioner, prescribes the tax laws. The Commissioner's rulings have only such force as Congress chooses to give them, and Congress has not given them the force of law. Consequently it would appear that the Commissioner's acquiescence in an erroneous decision, published as a ruling, cannot in and of itself bar the United States from collecting a tax otherwise lawfully due.

Do the 1976 regulations merely correct previous erroneous interpretations of the law? We believe determination of this question must await a full evaluation of plaintiff's various attacks upon the substance of the 1976 regulations, to be discussed *infra*. If plaintiff prevails in its attacks upon the validity of the 1976 regulations *per se*, the retroactivity issue will be moot. For purposes of the present limited issue, we hold that justified *reliance* upon a *settled* rule of law is not present in this case so as to bar retroactive application of the 1976 regulations.

This is not the type of private ruling, aimed only at SBL, that the courts have found sufficient to constitute "reliance".

In abuse of discretion cases, the courts have found reliance only where a prior ruling had been issued directly to the taxpayer. If a private ruling was not issued directly to the taxpayer, or if the ruling was published, courts reasoned that the reliance was unjustified, since the Commissioner had publicly maintained his right to retroactively revoke such rulings. This position has also derived support from the view that the Commissioner should not, in general, be barred from retroactively correcting a mistake of law. [Comment, *supra*, 23 U.C.L.A. L.Rev. at 542]

It is also important to note that the evidence before the Court indicates that while SBL may have relied upon the 1971 version of the regulations in filing its tax return, it did not rely upon those regulations in making the transaction with the Society. Only after the transaction was consummated did plaintiff begin to seriously consider its tax consequences.

Nor was the law "settled" at the time plaintiff filed its 1971 tax return. The *Kentucky Central* case, issued January 11, 1972, gave the Tax Court's approval to the I.R.S. litigation position that Example (1) was an erroneous statement of the law. It was this very I.R.S. litigation position which was embodied in the 1976 version of the regulations.

(2) The extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent Code provisions.

Congress has not enacted into law the 1971 version of the regulations. Nonethe-

less, plaintiff argues that the 1971 regulations constitute a "contemporaneous construction" of the original statutory provisions which remained unchanged for 14 years during which time Congress reconsidered and frequently amended the provisions of the statutory scheme. Plaintiff quotes from *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979):

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. See *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 [68 S.Ct. 695, 698, 92 L.Ed. 831] (1948); *Helvering v. Winmill*, 305 U.S. 79, 83 [59 S.Ct. 45, 46, 83 L.Ed. 52] (1938).

Plaintiff relies upon *Helvering v. Reynolds Co.*, 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939), for the proposition that the failure of Congress to act specifically since the 1962 promulgation of the 1971 regulations indicates implicit congressional approval of the interpretation of the statutory scheme as spelled out in those regulations. Such an argument was rejected in *Anderson, Clayton & Co. v. United States, supra*, 562 F.2d at 984–985 n. 29:

The party seeking to escape retroactive application of the new regulation will argue that *Helvering v. R. J. Reynolds Tobacco Co., supra*, 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536, precludes such retroactive effect. It has been held, however, that the *Reynolds Tobacco* principle (that

by repeated reenactment of a statute Congress gives its sanction to existing regulations) is applicable only when the regulations are legislative as opposed to "administrative" in character. *Automobile Club of Michigan v. Commissioner of Internal Revenue*, 20 T.C. 1033, 1041 (1953), aff'd 230 F.2d 585, 589 (6th Cir. 1956), aff'd, 353 U.S. 180, 185–86, 77 S.Ct. 707 [710–11], 1 L.Ed.2d 746, 751 (1957). *See also Helvering v. Reynolds*, 313 U.S. 428, 61 S.Ct. 971, 85 L.Ed. 1438 (1941), which confined *Reynolds Tobacco* to its facts, specifically the existence of a prior Regulation that negatived a tax liability that the new and putatively retroactive regulation proscribed, and announced that Congressional reenactment of a statute that had been given a settled construction was no more than an aid in statutory interpretation and, where no regulations embodied the prior construction, did not preclude retroactively applying a regulation contrary to that construction.

In light of these standards, we are unable to detect in the actions of Congress any implicit approval of the 1971 version of the regulations which would be so manifest as to make inappropriate the retroactive application of the 1976 regulations, if we deem the 1976 regulations an appropriate guide to the proper tax treatment of the assumption reinsurance transaction.

(3) Whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers.

The Court has no information indicating that a retroactive application of the 1976 regulations would lead to a situation where SBL was not treated equally as compared to similarly situated taxpayers. Therefore, the presumption of retroactivity is not overcome by reference to this consideration.

(4) Whether according retroactive effect would produce an inordinately harsh result.

The effect of a ruling in defendant's favor as to this issue is to open the way for a

decision which would prevent plaintiff, a consistently prosperous company, from claiming a large loss on its 1971 income tax return and carrying it back to nullify its 1968 income tax liability. Being deprived of a significant advantage, under these circumstances, is not the type of "inordinately harsh result" which this court believes to be contemplated as providing an exception to the general rule of retroactivity.

Upon consideration of all the relevant factors, the Court concludes that the filing of plaintiff's 1971 tax return would be controlled by the regulations in effect in 1976, if the latter regulations, as interpreted and applied by defendant, were sustained by the Court as a proper method of treating the assumption reinsurance transaction which is the subject of this case.

### (C) *The Merits*

█ Having determined that the 1976 regulations are potentially retroactive, we must decide whether (a) they apply here, and (b) if so, whether they should be sustained by the Court as a proper interpretation of the law. After evaluating the lengthy legal arguments of the parties in light of the expert testimony presented at trial, the Court answers both these questions in the negative and, as to Issue Number One, holds generally for the plaintiff.

(1) Are the 1976 regulations applicable?

Although capable of retroactive application, as discussed above, we conclude that the 1976 regulations are not technically applicable to the case at hand.

As explained above, the *Kentucky Central* case clearly involved a netting transaction. The 1976 regulations were implemented to strengthen the I.R.S. litigation position as to the proper treatment for such a netting situation. The August, 1975 notice at 40 Fed.Reg. 34128 (8/14/75), indicated that the new regulations provided new examples to illustrate the tax consequences in "netting" transactions.

The text of the 1976 regulations provides that

... where the reinsured transfers to the reinsurer in connection with an assumption reinsurance transaction a *net* amount which is less than the increase in the reinsurer's reserves resulting from the transaction, the reinsurer shall be treated as—(A) having received from the reinsured consideration in an amount equal to the net amount of the increase in the reinsurer's reserves resulting from the transaction, and (B) having paid the reinsured an amount for the purchase of the contracts equal to the excess of the amount of such increase in the reinsurer's reserves over the *net* amount received from the reinsured. [emphasis added]

The new examples in the 1976 regulations appear to be either explicit or implicit "agreed to" netting transactions. Defendant argues that the true consideration which passed in this case was disguised, and claims that a netting transaction occurred. We disagree.

In this case, the Society transferred to plaintiff *all* its policies and *all* its assets which were set aside to pay claims made on those policies. There was simply no room in this transaction for a netting which would have disguised the true consideration which passed back and forth.

Plaintiff's potential profit from the transaction stems not from any disguised consideration passing back and forth pursuant to the agreement with the Society. Rather, the potential profit comes from the fact that the actual experience with the Society's policies in terms of premiums received and benefits paid may turn out to be more favorable than predicted by the conservative actuarial assumptions required by the State of Kansas in calculating reserves.

Defendant purports to find a netting in plaintiff's decision to accept premiums of $15 per thousand dollars of coverage—a sum insufficient to cover projected benefits payable under the State's conservative assumptions. This decision may be indicative that plaintiff expects its actual experience to be more favorable than the conservative actuarial calculations predict, but it is not indicative of a netting transaction. Again, we stress that the Society transferred *all* its policies and *all* its assets.

In all of the 1971 and 1976 examples, the insurance company taxpayer is required to take into account as income only what was agreed, explicitly or implicitly, to be paid. The 1976 examples pertaining to netting are not applicable here.

(2) Should the 1976 regulations be applied in the manner suggested by defendant?

Assuming for purposes of argument that netting is not a basis for disregarding the 1976 regulations, we further conclude that they should not be applied in the manner suggested by defendant. We believe the proper method of treating this assumption reinsurance transaction is that suggested by plaintiff. We believe that "weighty" reasons exist for adopting plaintiff's point of view.

Plaintiff counted as income the approximately $6 million it received in assets from the Society. Plaintiff deducted the approximately $8 million it established as a reserve to cover the increased liabilities on the policies it was transferred. This procedure, which results in a deduction of approximately $2 million in excess of income, seems to accord with the requirements of 26 U.S.C. § 809.

Defendant's basic position is that the difference between what plaintiff incurred in liabilities ($8 million) and the amount plaintiff received in assets ($6 million) must be imputed as income in supposed compliance with the 1976 regulations discussed above. We concur with plaintiff's view that to impute to plaintiff some $2 million in income as the value of obtaining the policies, and to then require the assumption that plaintiff paid the Society $2 million for those policies, is not in accord with the laws as passed by Congress. Plaintiff describes this double imputation as "mechanical and arbitrary", and we agree.

As noted above, 26 U.S.C. § 809(c)(1) requires that an insurance company take into account as income "( . . . consideration in respect of assuming liabilities under contracts not issued by the taxpayer) *on* insurance and annuity contracts." Correspondingly, the ceding company in an assumption reinsurance transaction is entitled to a deduction under § 809(d)(7) for "consideration" it pays the reinsurer.

Congress used the same term "consideration" to describe the amount which the reinsurer must include as income [§ 809(c)(1)] and the amount which the ceding company may deduct [§ 809(d)(7)]. This same term is used in § 809(c)(1) to refer to the amount of income includable on the initial issuance of a policy. If this term is interpreted consistently throughout, as it should be, it is clear that it does not include the intangible value of the "underlying contracts" which defendant seeks to impute in this case.

By arbitrarily stating that because plaintiff accepted $2 million more in liabilities than it received in assets, plaintiff should be deemed to have received $2 million as the intangible value of the underlying contracts, defendant places a false value on the so-called "right" to collect premiums in the future. Because the insured may stop paying such premiums at any time, this so-called "right" is but an expectation. Furthermore, in this case, it is an expectation that carries with it the obligation to pay a much larger sum in expected future benefits. In *Mutual Savings Life Ins. Co. v. United States, supra,* 488 F.2d at 1142, the Court surveyed the law and concluded:

It appears clear, therefore, that *neither the law* nor the regulations intended tax consequences to flow from anything but the tangible transfers made between the parties in the way that they are made. At no place does *the law* or the regulations indicate that the intangible value of the policies is to be treated as consideration received from the reinsured. (emphasis added)

The I.R.S. may have attempted to change the regulations in this regard, but the law has not changed, and cannot be substantively altered by the I.R.S.

Although defendant wishes to compare this transaction to others [such as deficiency reserve deductions and reevaluation of reserves], it is best compared with a situation where an insurance agent has sold a

policy. The agent's commission, a cost incurred in putting business on the books which is comparable to the acquisition of business here, is expensed. Importantly, the future premium income which the company expects to receive from the newly-sold policy, is not imputed to the company at that time.

It is good to remember that SBL was a purchaser in this transaction. It is quite rare that income is imputed to any *purchaser* in a sales transaction.

Defendant contends that its imputation policy merely applies the rule that in an arm's length transaction, it is assumed that equal value is exchanged by the parties. That is to say, defendant contends that because SBL incurred obligations of approximately $8 million, it can be assumed that it received approximately the same amount in value from the Society. This argument ignores the fact that plaintiff's calculation of reserves is constrained by state law and that plaintiff's potential for profit (or even to break even) arises from the expectation that its actual experience will turn out more favorably than the conservative actuarial prediction demanded by state law.

Perhaps the most accurate way to have handled this situation would have been for SBL to have calculated its reserves using a more realistic 5¾% interest figure, rather than the 3½%. This would have resulted in a very small reserve calculation. However, the 3½% figure was the smallest allowable under state law. Plaintiff reached the largest reserve figure which it could properly calculate under the state law.

Defendant claims further that 26 U.S.C. § 446(b) gives the I.R.S. the authority to require a taxpayer to alter its method of accounting if that method does not "clearly reflect income." We view this section as inapplicable to the case at hand. The authority to require accurate methods of accounting to clearly reflect income is not tantamount to the authority to impute income where none exists. The plaintiff's method of accounting accurately reflects the income, as that term is defined under § 809, that plaintiff received in the assumption reinsurance transaction.

Defendant further objects that absent such an imputation of income, there will be a "distortion" of income, and plaintiff will be able to control its own taxable income by the use of the arbitrary assumptions which underlie the reserve calculations. This argument again ignores the fact that plaintiff's calculations of reserves are constrained by state laws. More importantly, no taxes are avoided in this circumstance. Plaintiff's method of accounting accurately reflected the income it received during the assumption reinsurance transaction. As premiums are received in the future and as reserves are reduced, plaintiff will report these as income and pay taxes thereon. It is one thing to tax today the assets actually received from the Society. It is quite another thing to attempt to impute income on the basis of future premium payments and future reserve reductions which will be taxed in the normal course of events as they occur.

Defendant's other approach to the question of how to handle the assumption reinsurance transaction is to ignore the income imputation concepts which we have just discussed and frame the issue as one of how plaintiff should deduct its $2 million loss, admitting that such a loss occurred. In making this alternative argument, defendant states that it does not dispute that plaintiff suffered a loss of approximately $2 million, but only challenges plaintiff's attempt to deduct the entire loss in one year. Defendant claims that under 26 C.F.R. § 1.817–4(d)(2), the loss must be spread over a 10-year period (accepting this as the "reasonably estimated life" of the policy).

But plaintiff persuasively argues that § 809(d)(2) allows a deduction in full for the amount of reserves established under state law. There is no question that plaintiff's establishment of a reserve as a consequence of the assumption reinsurance transaction was in accordance with state law. The expert testimony presented by defendant was to the effect that absent extremely persuasive reasons, a properly established

reserve should be deductible in one year under § 809(d)(2).

As plaintiff has pointed out in several spots in its briefs, the laws, ever since 1959, have recognized that reserves and reserve deductions may exceed premium income. As an example, premiums charged for a single premium immediate annuity are often less than the reserves established for such a contract. See also Example (1) of the 1971 regulations.

Defendant contends that it is doing nothing more than disallowing as a current deduction the cost of an acquisition which should be deducted over the lifetime of the policy. Plaintiff accurately points out that it took no cost of acquisition deduction, so there is nothing to spread over a longer period of time. This fact distinguishes the case from *Southwestern Life Ins. Co. v. U. S.*, 560 F.2d 627 (5th Cir. 1977).

To the extent that defendant seeks to force such a spread, it contravenes the clear Congressional intent underlying § 809(d)(2). In the *Mutual Savings* case, *supra*, 488 F.2d at 1147, the court stated:

> The crux of this law goes not to whether the sums are to be taxed, but when they will be taxed. Eventually the Government will receive tax on every dollar of income which the transactions generate. *The law having provided for postponement of the tax on the amount placed in reserves, the IRS by administrative action is not now entitled to nullify that benefit.* (emphasis added)

Defendant attempts to analogize the situation to one involving a change of basis under 26 U.S.C. § 810(d). However, the spread rule of § 810(d) applies only to a change in initial reserve assumptions and only to contracts issued before the taxable year in which the change in assumptions occurs. There was no change in basis here. As is pointed out by plaintiff:

> The spread rule of section 810(d) referred to by Defendant applies *only* to a *change* in the initial reserve assumptions and *only* to contracts issued by a company *before* the taxable year in which the *change* in assumptions occurs. There is

no "spread" required, however, as to any part of a deduction which results from "discretionary" reserve assumptions on contracts issued by a company during the same taxable year. Such an activity must be considered as part of the normal operations of an insurance company. Even if the contracts issued are *identical* to those issued in prior years, but the reserve assumptions have been changed, there is *no* spread of any differential in reserves. Different reserve assumptions clearly lead to different deductions, but there is no Congressional requirement to spread any part of such reserve deductions absent the change in basis referred to in section 810(d).

Defendant's interpretation of § 809(c)(1) requires capitalization of the cost of acquiring business in order to get an accurate reflection of income. But plaintiff accurately points out that this is not consistent with the method by which commissions (another comparable cost of acquiring business) are handled.

All in all, we are not persuaded by any of defendant's arguments that the plain wording of § 809(d)(2) should be ignored. The Court is unable to accept the regulations of the I.R.S. in the form in which defendant seeks to apply them here. Although we have no quarrel with the bulk of the regulations, defendant's proposed application of said regulations to the case at hand produces unacceptable results.

ISSUE NUMBER TWO: IS ANY PART OF SBL's 1971 YEAR–END RESERVE FOR BENEFITS PROVIDED TO SOCIETY MEMBERS A "DEFICIENCY RESERVE" WITHIN THE MEANING OF 26 U.S.C. § 801(b)(4)?

*FINDINGS OF FACT*

1. A deficiency reserve is defined for tax purposes in § 801(b)(4) as "... that portion of the reserve for such contract equal to the amount (if any) by which—(A) the present value of future net premiums required for such contract, exceeds (B) the present value of the future actual premi-

ums and consideration charged for such contract."

2. Reserves on policies are defined, actuarially and pursuant to local law, as the excess of the present value of future benefits over the present value of future net premiums. The present value of future benefits is the value at any given time, computed in accordance with a selected mortality table and an assumed rate of interest, of the benefits which will have to be paid by the company with respect to a given policy. The net premium is the amount which must be collected so that the amount collected, plus interest at the same assumed rate, will exactly satisfy these benefits over the life of the policy. The net premium is calculated, then, so that at the inception of the policy, the present value of future net premiums is equal to the present value of future benefits. Thus, at the inception of the policy there is no excess of the present value of future benefits over the present value of future net premiums. As the years pass, however, the present value of future benefits increases while the present value of future net premiums decreases. Thus, the reserve begins to grow until it reaches, at maturity, the face amount of the policy. At any given point, the reserve may be viewed prospectively as the excess of the present value of future benefits over the present value of future net premiums, or retrospectively as the net premiums assumed to have been received, plus interest at the assumed rate, less death benefits assumed to have been paid.

3. A deficiency reserve, thus, is calculable as of the moment a policy is issued. It is calculated for an individual contract as of the inception of the insurance obligation because only at that time is the net single premium or the annual net premium ascertainable by reference to the issue ages of the insureds.

4. The net premium, so important in calculating reserves, is a theoretical, actuarially computed amount, inseparably involved in the formula for determining the reserve, upon which the amount of the reserve directly depends.

5. With respect to those policyholders whose attained age on July 1, 1971, was 37 or younger, the plaintiff's actuary, as explained above, computed the net premiums by assuming that the policies were issued on July 1, 1971. The actuary computed the annual amount which would have to be collected so that the amount collected, plus interest at the assumed rate, would exactly cover future benefits. With respect to these policies, then, the present value of future net premiums was equal to the present value of future benefits on July 1, 1971, and there were no reserves. The net premiums so calculated were less than the $15 gross premium actually charged.

6. With respect to those policyholders who had reached an attained age of 38 or older on July 1, 1971, the net premiums computed on this basis were greater than the $15 gross premiums. The present value (on July 1, 1971) of the net premiums so computed, exceeded the present value of the future actual premiums, plus the $6 million in transferred assets, by $2 million.

7. The Society had not estimated or computed reserve liabilities on the basis of mortality tables and assumed rates of interest.

8. Society members had obtained insurance from the Society at different times and at different ages.

9. Knowledge of the different issue dates and the different durations is essential in ascertaining the reserves required under the net level premium method of reserve computation, but very little of this information was available to plaintiff in 1971. Without such information, the company's actuary was required to estimate net premiums and reserves on policies that had been in existence a number of years.

10. The actuary did know the year of birth of most of the insureds so he could determine mortality under the 1958 C.S.O. table with a three-year setback (due to the longer life expectancy of women). He also knew that plaintiff would be receiving annual premiums of $15 per $1,000 from the insured in the future.

11. In estimating the proper reserve at a time which was not the inception of the insurance contract obligations, the company's actuary determined that it would be reasonable to use $15 per $1,000 as the assumed annual net premium on contracts issued to insured members who had attained the age of 38 and the lesser annual net premium provided under the 1958 C.S.O. 3½% table as to contracts issued to insureds who had not attained the age of 38.

12. Such an assumption was consistent with prior experience as the amounts accumulated by the Society in its insurance funds were roughly equivalent to the prior net premiums (plus interest, less claims).

13. The Kansas Insurance Department did not require plaintiff to establish a deficiency reserve as to any liability plaintiff may have assumed upon the assumption reinsurance transaction with the Society.

14. Because the present value of the $15 actual premiums was equal to or greater than the present value of the future annual net premiums, according to the reasonable method used by plaintiff to calculate the reserve, there was no deficiency reserve.

### DISCUSSION OF LAW

■ Defendant's alternative position regarding the assumption reinsurance transaction revolves around the concept of deficiency reserves. Defendant argues that if income is not imputed to plaintiff as defendant requested under Issue Number One, then a deficiency reserve, which is non-deductible, must be found in the reserves calculated by plaintiff.

To repeat what has been mentioned above, a reserve is calculated by subtracting the present value of future net premiums from the present value of future benefits [Reserve = PVFNB − PVFNP]. Sometimes an insurance company will charge a policyholder less than the net premium. If so, a deficiency reserve is calculated, so that it may be guaranteed that the company will have sufficient revenues on hand to pay any benefit obligations which arise [Deficiency reserve = PVFNP − PVFGP, where GP = gross or actual premiums charged].

Defendant's main objection to plaintiff's tax treatment of the reserve question centers on the decision of plaintiff's actuary to use $15/thousand as the net premium for policyholders 38 years old and older. This figure, of course, represents the actual or gross premium. By using the actual premium as the net premium figure in computing reserves, plaintiff effectively eliminated the possibility of a deficiency reserve. Thus, defendant argues that plaintiff's total reserve figure contains a non-dductible deficiency reserve of about $2 million which is "disguised".

Defendant claims that the need for such a deficiency reserve may be seen from the fact that plaintiff incurred $11 million in liabilities, received only $6 million in assets, and will receive only $3 million in future premiums, leaving a $2 million shortfall. That shortfall, argues defendant, should be filled with a $2 million (approximately) deficiency reserve.

Although defendant's argument is a strong one, we are more persuaded by plaintiff's position.

The $2 million shortfall in this case which defendant insists should be filled by a deficiency reserve, results from the decline in market value of the assets of the Society. If the assets are treated at their par value (which plaintiff did for Annual Statement purposes, but not for income tax purposes), the shortfall disappears. Thus, the question, in essence, is whether a reinsurer in an assumption reinsurance transaction should be required to establish a deficiency reserve under such circumstances. We say "no".

We first note that normally deficiency reserves are calculated at the time a policy of insurance is issued. The deficiency reserve is a product of a theoretical calculation because it is the difference between a gross premium and a larger (hypothetical) net premium. Therefore, had plaintiff issued the policies in question, a deficiency reserve would not have arisen from the decline of the market value of assets which occurred well after the issuance of the policy. In *Mutual Benefit Life Ins. Co. v.*

*C.I.R.*, 488 F.2d 1101, 1108–1109 (3d Cir. 1974), the court noted:

It may be seen that one of the distinguishing characteristics of a "deficiency reserve" is that it is calculable at the moment of issue of a policy.

. . . . .

A "deficiency reserve" is not used to increase a policy "basic reserve" which was adequate when issued. With this explanation as a background, it is clear that a "deficiency reserve" as that term is used in the industry is not applicable to an "additional reserve" which is set up after the policy is issued and to deal with problems that arose *after* issue.

*See also Lincoln Nat. Life Ins. Co. v. United States*, 582 F.2d 579, 587–588 (Ct.Cl.1978).

Further, defendant cites no authority indicating that an independent assessment of the deficiency reserve situation should be undertaken by a reinsurer following an assumption reinsurance transaction. As indicated above, normally deficiency reserves are calculated at the time of a policy's issuance and nothing that the Court has been able to locate in the law or the regulations directly indicates that the occurrence of an assumption reinsurance transaction should occasion a reevaluation of deficiency reserves.

Defendant takes particular umbrage at plaintiff's use of $15 as the net premium for calculation of reserves for policyholders 38 years old and older. Such an action effectively eliminated the possibility of a deficiency reserve by making the net premium an identity with the gross or actual premium. However, it is uncontroverted that plaintiff's actuary simply did not have available at the proper time the information (such as the age of policyholders at issuance and duration of the policies) necessary to calculate a proper net premium.

Under these adverse circumstances, plaintiff's actuary undertook to attempt to calculate a reasonable reserve. Equating net premium with the $15 gross premium was a reasonable step because a lower gross premium had produced for the Society assets whose cost roughly matched the benefit lia-

bilities incurred. The par value of the assets transferred by the Society exceeded the reserves which plaintiff calculated. The gross premium charged by the Society had not been underestimated; rather, to repeat, the $2 million shortfall was caused by a decline in the market value of the Society's bonds.

If the utilization of this figure was reasonable, then the final calculation should not be disturbed. The Congressional history behind the relevant acts indicates that the deficiency reserve is to be calculated by looking at the present value of the future net premiums as "set by the taxpayer's standards." 1959–2 C.B. 770, 800.

Defendant's expert admitted that there is no strong reason to invalidate a reserve estimate calculated in accord with state law and approved by state insurance officials. Here, the plaintiff's reserve calculation was approved by the state officials. Given plaintiff's compliance with state laws and the demands of state insurance officials, the reserve as calculated may be deemed reasonable and no room exists for defendant to substitute its judgment for that of the plaintiff's actuary. *United States v. Consumer Life Ins. Co.*, 430 U.S. 725, 749–750, 97 S.Ct. 1440, 1453, 52 L.Ed.2d 4 (1977); *Central Nat. Life Ins. Co. of Omaha v. United States*, 574 F.2d 1067, 1082 (Ct.Cl. 1978).

The policies in question did not have their inception in July of 1971. It is stipulated that they were in force prior to the assumption reinsurance transaction. They are clearly policies issued by an entity other than plaintiff. The calculation of a deficiency reserve, therefore, was not required.

ISSUE NUMBER THREE: HOW SHOULD PLAINTIFF'S 26 U.S.C. § 481 ADJUSTMENT IN RESPONSE TO THE *STANDARD LIFE* CASE BE CALCULATED?

*FINDINGS OF FACT*

1. The price which an insurance company charges a policyholder is referred to as

the "gross premium," which consists of a "net valuation premium" and "loading". The net valuation premium, as explained above, is the amount needed to cover the death benefits payable under the policy. "Loading" is the difference (if any) between the gross premium and the net valuation premium. Loading is considered to be an amount which provides for expenses such as a company's general overhead, the payment of commissions, state taxes, etc.

2. Although gross premiums typically are calculated and quoted on an annual basis, policyholders often pay such premiums on a semi-annual, quarterly, or monthly basis. "Deferred premiums" are premium installments which remain to be paid after December 31 (the end of an insurance company's tax year) and before a policy's next annual renewal date. "Uncollected premiums" are premiums due but not paid as of December 31 on insurance policies still in effect under grace period provisions.

3. Policyholders have no obligation to pay deferred or uncollected premiums to an insurance company.

4. Life insurance reserves are defined prospectively as the excess of the present value of future benefits over the present value of future net premiums, as noted above. When a premium is considered "received" for reserve purposes, the present value of *future* net premiums diminishes and the reserve increases. Life insurance reserves, as of the end of the calendar year, are computed on the assumption that premiums which are deferred and uncollected on that date have been received. Thus, these reserves are larger, to the extent of the net valuation portions of these premiums, than they would be if this assumption were not made. Consequently, the deduction for increases in reserves is larger than it would be if this assumption were made.

5. In June of 1977 in the *Standard Life* case the Supreme Court of the United States resolved the long-standing controversy between the Government and life insurance companies as to the proper time for the inclusion of loading on deferred and uncollected premiums in premium income by deciding that the statute required life insurance companies to exclude or deduct such loading in computing their income for tax purposes.

6. In years prior to 1971, it was plaintiff's view that loading (on deferred and uncollected premiums) should not be included in income or assets, although it was pursuant to adjustments required by the I.R.S.

7. Due to the erroneous position taken by the I.R.S. on this matter, plaintiff paid additional Federal income taxes as the direct result of the inclusion of loading in income.

8. As reported on plaintiff's 1971 Annual Statement, loading as of December 31, 1971 was $1,884,738.77.

9. The loading portion of deferred and uncollected premiums, on December 31 of each relevant year, as reflected on plaintiff's Annual Statement, was as follows:

| Year | Loading |
|------|---------|
| 1970 | $1,809,234 |
| 1969 | 1,118,347 |
| 1968 | 1,017,945 |
| 1967 | 1,067,036 |
| 1966 | 1,088,801 |
| 1965 | 1,168,715 |
| 1964 | 1,270,687 |
| 1963 | 1,173,153 |
| 1962 | 1,151,137 |
| 1961 | 873,290 |
| 1960 | 833,886 |
| 1959 | 664,243 |
| 1958 | 566,380 |
| 1957 | 566,273 |

10. The essence of the question presented in *Standard Life* was whether these balances would be included in income for the year which ended on each December 31, or the following year when they were actually received. Under the method required by the Internal Revenue Service prior to the *Standard Life* decision, the loading would be included in income for the prior year. Under the method determined appropriate in *Standard Life*, the loading would be included in income for the following year. Thus, the amounts includible under the two different methods would be as follows:

| Year | IRS | Standard Life | Difference |
|------|-----|---------------|------------|
| 1970 | $1,809,234 | $1,228,347 | $ 690,887 |
| 1969 | 1,118,347 | 1,017,935 | 100,402 |
| 1968 | 1,017,945 | 1,067,036 | (49,091) |
| 1967 | 1,067,036 | 1,088,801 | (21,765) |
| 1966 | 1,088,801 | 1,168,715 | (79,913) |
| 1965 | 1,168,715 | 1,270,687 | (101,972) |
| 1964 | 1,270,687 | 1,173,153 | 97,534 |
| 1963 | 1,173,153 | 1,151,137 | 22,016 |
| 1962 | 1,151,137 | 873,290 | 277,847 |
| 1961 | 873,290 | 833,886 | 39,404 |
| 1960 | 833,886 | 664,243 | 169,643 |
| 1959 | 664,243 | 556,380 | 107,863 |
| 1958 | 556,380 | 566,273 | (9,893) |
| | | Total: | $1,242,961 |

11. Over 55% of the post-1957 duplication of premium income is attributable to the year immediately preceding the year of change. Over 63% is attributable to the two years immediately preceding the year of change. Over 91% of the post-1957 duplication of premium income in the *new* business is attributable to the year immediately preceding the year of change.

12. Early in 1978 the Commission of Internal Revenue published Rev.Proc. 78–6, 1978–1 Cum.Bull. 558, describing the procedure whereby life insurance companies could request permission to change their method of accounting for loading on deferred and uncollected premiums to conform to the *Standard Life* decision. The Revenue Procedure provided that a company desiring to make the change should submit its request on a Form 3115. In May of 1978, plaintiff submitted to the Commissioner a Form 3115, requesting that it be allowed to change its method of accounting for loading on deferred and uncollected premiums to conform to the *Standard Life* holding. Plaintiff claimed that the appropriate adjustment under § 481 is a $1,242,-961 offset against premium income. Plaintiff demanded that the entire adjustment be taken in 1971. After this action commenced, plaintiff claimed entitlement to an adjustment of $1,809,234, a sum which included the pre-1958 loading.

13. Plaintiff will obtain no significant tax benefit if it is required to reflect the § 481 adjustment ratably over a ten-year period because of the § 809(f) limitations on "Phase II" deductions.

14. Plaintiff has never consented to take this adjustment into account in any manner other than in its entirety in 1971.

15. One facet of the dispute here involves how the § 481 adjustment is affected by an earlier election which plaintiff made pursuant to 26 U.S.C. § 818(c) to revalue its reserves. The net valuation portion of deferred and uncollected premiums is added to reserves. The size of the net valuation portion depends upon the reserve valuation method used. The methods used fall into two categories: the net level premium method and the preliminary term method. Under the net level premium method the amount added to the reserve upon the receipt of each premium is constant over the life of the policy. Under a preliminary term method, the amount added to the reserves is lower in the first year, or first several years, and higher during the remaining years, than it would have been under the net level premium method.

16. The preliminary term method yields lower reserves, and, hence, lower reserve deductions, on new business than does the net level premium method. A company writing a substantial amount of new business may find that the preliminary term method has a more favorable impact on the Annual Statement. But for tax purposes it is in the interest of the company to have its reserves considered as high as possible. Consequently, companies that use the preliminary term method of valuing reserves for Annual Statement purposes may find it advantageous to recompute the reserves for income tax purposes under § 818(c) of the Internal Revenue Code. That section provides:

(c) Life insurance reserves computed on preliminary term basis:

For purposes of this part (other than section 801), at the election of the taxpayer the amount taken into account as life insurance reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined on either of the following bases:

(1) Exact revaluation

As if the reserves for all such contracts had been computed on a net level premium basis (using the same mortality assumptions and interest rates for both the preliminary term basis and the net level premium basis).

(2) Approximate revaluation

The amount computed without regard to this subsection—

(A) increased by $21 per $1,000 of insurance in force (other than term insurance) under such contracts, less 2.1 percent of reserves under such contracts, and

(B) increased by $5 per $1,000 of term insurance in force under such contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves under such contracts. If the taxpayer makes an election under either paragraph (1) or (2) for any taxable year, the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years unless a change in the basis of computing such reserves is approved by the Secretary, except that if, pursuant to an election made for a taxable year beginning in 1958, the basis adopted is the basis provided in paragraph (2), the taxpayer may adopt the basis provided by paragraph (1) for its first taxable year beginning in 1958, the basis adopted is the basis provided in paragraph (2), the taxpayer may adopt the basis provided by paragraph (1) for its first taxable year beginning after 1958.

17. An election under § 818(c) to take into account as insurance reserves for Federal income tax purposes the amount computed under § 818(c)(2) does not affect the way that loading, or the amount of life insurance reserves, or any other item, is reflected on a company's Annual Statement.

18. The amount of the increase in reserves under § 818(c)(2) depends upon the face amount, the type, and the duration of the insurance determined at the time of issuance.

19. The increase in the amount taken into account as life insurance reserves under § 818(c)(2) will be exactly the same regardless of the amount of a life insurance company's loading.

20. The amount of loading at the end of a taxable year depends upon the frequency with which premiums become due, the distribution of policy anniversary dates, the method used to compute Annual Statement life insurance reserves, and the amount of premiums not paid at the end of the taxable year.

21. The factors that determine the amount of the increase in reserves under § 818(c)(2) are not the same as the factors that determine the amount of loading on unpaid premiums.

*DISCUSSION OF LAW*

Both parties agree that plaintiff is entitled to an adjustment in its taxable income as a result of the Supreme Court's decision in the *Standard Life* case, where it was held that a life insurance company did not have to include loading on deferred and uncollected premiums in assets or premium income. Plaintiff seeks an adjustment for the loading on deferred and uncollected premiums which it included in gross premium income for the years 1958 through 1970.

The government recognizes plaintiff's right to an adjustment and the right to take that adjustment (at least in part) in 1971. However, three questions do arise in connection with the § 481 adjustment. First, should the adjustment be affected by plaintiff's § 818(c) election to revalue reserves? Second, should the adjustment be spread over a ten-year period rather than being taken wholly in 1971? Third, should the adjustment include or omit pre-1958 loading figures? We shall address these issues *seriatim*.

(A) *§ 818(c) election.*

█ Should the § 481 adjustment to which plaintiff is admittedly entitled be affected by plaintiff's § 818(c) election to revalue reserves? Defendant would answer the question affirmatively. Plaintiff, pursuant to § 818(c) of Title 26, elected to

convert preliminary term reserves to net level premium reserves—an act which allows plaintiff to report greater reserves for federal income tax purposes by reporting a higher portion of each gross premium as constituting a net valuation premium, leaving a smaller amount of loading in the first policy year. But plaintiff has used reserve figures on the annual statement to calculate the § 481 adjustment.

Defendant argues that to allow plaintiff to use the amount of loading reported on the annual statement without adjusting the loading consistent with plaintiff's § 818(c) election would give plaintiff a deduction in income in excess of the amount originally included in premium income.

We are not persuaded by defendant's position, and feel that it can be quickly rejected. Plaintiff accurately argues that an election to revalue reserves under § 818(c) in no way affects the amount of loading reported on the annual statement, which is the amount the IRS erroneously required plaintiff to include as income during the years of 1958 to 1970. Both the *Standard Life* decision and Rev.Proc. 78–6, which was promulgated to guide § 481 adjustments necessitated by the *Standard Life* decision, refer to annual statement loading—a figure unaffected by plaintiff's § 818(c) election.

The defendant's position on this issue was squarely rejected in *Reserve Life Ins. Co. v. United States,* 45 A.F.T.R.2d 80–893 (Ct.Cl. 1980), wherein the trial judge stated:

> Both parties in the present case obviously accept the Standard Life rule. The difference between the parties is that the Government says the plaintiff's action in revaluing its preliminary term reserves to an approximation of net level premium reserves for tax purposes must necessarily be accompanied by a corresponding change for tax purposes in the net valuation premium portion and the loading portion of the plaintiff's unpaid premiums, as shown on the Annual Statement, whereas the plaintiff contends that the revaluation of reserves for income tax purposes under section 818(c)(2) does not require any change whatever in the net valuation premium portion and the loading portion of unpaid premiums.

The language of section 818(c), previously quoted in the opinion, refers only to a recomputation for income tax purposes of "the amount taken into account as life insurance reserves," and does not state, either expressly or by clear implication, that a life insurance company which accepts the benefit of such a recomputation must also go further and recompute for tax purposes the net valuation premium portion and the loading portion of the company's unpaid premiums, as shown on its Annual Statement.

Also, it will be recalled that the Senate Finance Committee's explanation of the reason for the enactment of section 818(c) referred to the "hardship on insurance companies using preliminary term reserves as compared with those which use ordinary reserves," and indicated that it was to "avoid this result" that life insurance companies which had computed their reserves on a preliminary term basis for Annual Statement purposes were to be permitted to recompute their reserves for income tax purposes on an actual net level premium basis or under the formula set out in section 818(c)(2). Seemingly, the congressional purpose was to be achieved and completed through—and only through—granting an insurance company the right to recompute preliminary term reserves for income tax purposes, if the company wished to do so.

Moreover, the data in the plaintiff's Annual Statement, including the allocation of the company's deferred and uncollected premiums as between the net valuation portion and the loading portion thereof, are derived from an accounting system approved by the National Association of Insurance Commissioners. This system has a statutory basis (see section 818(a) of the Internal Revenue Code) and—as the Supreme Court said in *Commissioner v. Life & Accident Insurance Company,* supra, 433 U.S. at 151 [97 S.Ct. at 2525]—it provides guidance for courts in considering problems that relate to the

income taxation of insurance companies. Consequently, it would require a stronger showing of necessity than is present in this case to justify a court in holding that the Annual Statement allocation of unpaid premiums as between the net valuation premium portion and the loading portion must be changed for income tax purposes merely because an insurance company has exercised its statutory privilege by revaluing preliminary term reserves for income tax purposes.

An election to determine the amount of life insurance reserves taken into account for federal income tax purposes under section 818(c)(2) does not affect the way that loading on deferred and uncollected premiums, or the amount of life insurance reserves, or any other item, is shown on the company's Annual Statement.

The amount of the increase in life insurance reserves produced by a section 818(c)(2) election will be exactly the same regardless of how much loading on deferred and uncollected premiums a life insurance company has. Moreover, the amount of loading on deferred and uncollected premiums will be exactly the same regardless of the amount of the increase in life insurance reserves produced by an election under section 818(c)(2).

### (B) Timing.

█ Should the adjustment be spread over a ten-year period rather than being taken wholly in 1971?

Defendant argues that a distortion will occur if plaintiff is entitled to take the entire adjustment in loading allowed by the *Standard Life* decision in a single year where it is clear that the loading was accumulated over a 13-year period. The Commissioner of Internal Revenue refused to consent to such a one-year adjustment, and relies upon 26 U.S.C. § 446(e), which requires the Commissioner's approval before a taxpayer can change methods of accounting. Such consent is normally required even if the change contemplated is from an improper method to a proper method [*United States v. Kleifgen*, 557 F.2d 1293, 1297

(9th Cir. 1977)], and the purpose of the requirement is to allow the Commissioner to prevent distortions of income that often accompany changes of accounting methods. *Witte v. C.I.R.*, 513 F.2d 391, 394 (D.C.Cir. 1975).

Defendant points out that in Rev.Proc. 78–6 the Commissioner has indicated that he will not grant consent to a § 481 adjustment pursuant to the *Standard Life* decision unless the taxpayer consents to spread the adjustment over a 10-year period, or the number of years the old accounting method was used, whichever is less.

Plaintiff makes a persuasive argument against defendant's position, pointing out that an adjustment under § 481 is normally taken in one year, especially where the adjustment results in a decrease in taxable income. 26 C.F.R. § 1.481–1(c)(4) provides:

If the adjustments required by section 481(a) as a result of a change in method of accounting decrease taxable income for the taxable year of the change, such decrease is taken into account for that year and the provisions of section 481(b) do not apply....

It is also important that the 10–year spread referred to under Rev.Proc. 78–6 occurs only where the taxpayer consents to it. Further, Rev.Proc. 78–6, in § 6.05 states that if the taxpayer does not request the Commissioner's consent to the change, as plaintiff has done here, the Commissioner will force the change to be taken *in a single year.*

The evidence before the Court indicates that defendant's erroneous position regarding the treatment of loading on deferred and uncollected premiums required plaintiff to pay substantial extra taxes in the years from 1958 to 1970. The evidence further indicates that to require the adjustment to be spread over a 10-year period would prevent plaintiff from obtaining any significant tax relief from the § 481 adjustment. The inequity of this situation is intensified by the fact that a large percentage of the total loading in question stemmed from the two years just preceding the year of adjustment.

Under these facts, we believe it is an abuse of discretion for the Commission to refuse to allow plaintiff to take the total adjustment in 1971. The case of *National Bank of Fort Benning v. United States*, 79–2 U.S.T.C. ¶ 9627 (1979) stands as persuasive authority for plaintiff's position, and defendant has not successfully distinguished it.

### (C) *Pre-1958 loading.*

Should the adjustment include or omit pre-1958 loading figures? Defendant's position is that the adjustment must omit the pre-1958 loading, which, in light of our previous holdings, would mean plaintiff is entitled to an adjustment of a little more than $1.2 million. Plaintiff argues that the adjustment should include the pre-1958 loading, a sum of about $566,000. The plaintiff's position on this issue expands its prelitigation claims.

Defendant points out that the § 481 adjustment is aimed at avoiding a duplication of premium income reported on the federal income tax form. Premium income was not taxed before 1958. Therefore, defendant argues, pre-1958 loading should be excluded from the § 481 adjustment because no duplicative taxation would occur if that amount were reported. Defendant's position seems consistent with the Supreme Court's decision in *Standard Life*. This position is fortified by Rev.Proc. 78–6, which requires that a § 481 calculation omit pre-1958 loading from the adjustment.

Plaintiff seeks to include the pre-1958 loading income, thus increasing the amount of the adjustment. In support of its position, plaintiff makes a complicated argument based upon the fact that since 1958, plaintiff had taxed as income decreases in reserves which were established before 1958, on policies sold before 1958. The *Standard Life* decision, plaintiff argues, results in a duplication of pre-1958 underwriting income, though pre-1958 premiums technically were not subject to taxation.

Although we are intrigued by plaintiff's reasoning, we believe that the position proffered carries well beyond that justified by the Supreme Court's reasoning in *Standard Life*. We are not persuaded that Rev.Proc. 78–6 should be overruled on this point. We shall follow the defendant's view on this matter.

In summary, as to the § 481 adjustment issue, we have held (1) that the adjustment should not be affected by plaintiff's earlier § 818(c) election; (2) that the entire § 481 adjustment may be taken in 1971; and (3) that the pre-1958 loading of some $566,000 should be subtracted from the amount of the adjustment allowed.

## CONCLUSION

In conclusion, we have held that plaintiff's views regarding taxation of the assumption reinsurance transaction should prevail. We have also held generally for plaintiff regarding the § 481 adjustment, although we have held that pre-1958 loading should be excluded from the adjustment.

The ruling on the § 481 adjustment issue, in our view, moots plaintiff's motion for leave to take further depositions on the subject of the I.R.S. consideration of plaintiff's application. That motion, therefore, will be denied.

The parties have stipulated that upon the issuance of this opinion, they will attempt to agree upon the tax consequences which result from the Court's decision. Therefore, the Court will instruct the parties to consult with each other for purposes of drawing up a journal entry of judgment which will reduce to writing the tax consequences of this opinion. Upon the signing and filing of that journal entry, the time for appeal in this action will commence to run.

IT IS SO ORDERED.